

1  Suzanne Shell - pro se
2  dsshell@ix.netcom.com
   14053 Eastonville Rd.
3  Elbert, CO 80106
   Telephone: (719)749-2971
4  Fax: (719)749-2972
5
3  Defendant
7
8              UNITED STATES DISTRICT COURT
9            NORTHERN DISTRICT OF CALIFORNIA
10              SAN FRANCISCO DIVISION
11

12  INTERNET ARCHIVE                    CASE NO. C 06 0397 JSW
13      Plaintiff and Counterclaim Defendant
14      v.
15  SUZANNE SHELL                        RESPONSE TO MOTION TO
16                                       DISMISS COUNTERCLAIMS AND
        Defendant and
17                                       MEMORANDUM IN SUPPORT OF
        Counterclaim Plaintiff and
18                                       RESPONSE
        Third Party Plaintiff
19
        v.
20
21  AND RELATED COUNTERCLAIMS
22  AND THIRD PARTY CROSS CLAIMS
23
24  Comes now Suzanne Shell with her response to Internet Archive's MOTION TO DISMISS
25  COUNTERCLAIMS, requesting this Court to Deny said Internet Archive's MOTION TO
26  DISMISS COUNTERCLAIMS and in support thereof submits the following.
27
28

Response to Motion to Dismiss Counterclaim   page 1

1

## TABLE OF CONTENTS

2

3 INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

4 COPYRIGHT INFRINGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

5

3 CIVIL THEFT/CONVERSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

7 BREACH OF CONTRACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

8 RACKETEERING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

9

10 CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | <u>TABLE OF AUTHORITIES</u>

2

17 U.S.C. § 108. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
3
17 U.S.C. § 107(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
17 U.S.C. § 107(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
4
17 U.S.C. § 101. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
5
17 U.S.C. § 202. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
17 U.S.C. § 107 (1)-(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
3
17 U.S.C. § 106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
7
17 U.S.C. § 27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

8

A&M Records, Inc. v. Napster, Inc., 239 F. 3d 1004 (CA9 2001) . . . . . . . . . . . . . . . . . . . 17
9
Altera Corp. v. Clear Logic, Incorporated, 424 F.3d 1079, 76 U.S.P.Q.2d 1265
10
        (9th Cir. 09/15/2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
11
American Multi-Cinema Inc. v. City of Westminster, 910 P.2d 64
12
        (Colo.App. 07/13/1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
13
American Geophysical Union v. Texaco, Inc. 60 F.3d 913, 918 (2d Cir. 1994) . . . . . . . . . 9
14
Bowers v. Bay-state Techs Inc., 320 F.3d 1317, 1323-24 (Fed. Cir. 2003) . . . . . . . . . . . . 23
15
Branch v. Ogilvy & Mather, Inc., 772 F.Supp 1359, 1364 (S.D.N.Y. 1991) . . . . . . . . . . . . 9
16
Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994) . . . . . . . . . . . . . . . . 9, 14, 16
Careau & Co. v. Security Pacific Business Credit, Inc. (1990) 222
17
        Cal.App.3d 1371, 1388. In . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
18
Cedric Kushner Promotions, Ltd., v. Don King, 533 U.S. 158 (2001) . . . . . . . . . . . . . . . . 27
19
Cervantes v. United States, 330 F.3d 1186, 1187 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . 6
20
Chang v. Chen, 80 F.3d 1293, 1298 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Conley v. Gibson, 355 U.S. 41, 48 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
21
Construction Protective Services, Inc. v. TIG Specialty Ins. Co. (2002)
22
        29 Cal.4th 189, 199 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
23
Educational Testing Service v. Simon, 95 F. Supp.2d 1081, 1087 (C.D.Cal. 1999) . . . . . 9
24
Ehat v. Tanner, 780 F.2d 876 (10th Cir. 12/30/1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
25
Eldridge v. Block, 832 F.2d 1132, 1137 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Estelle v. Gamble, 429 U.S. 97, 106 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
26
Faith Ringgold v. Black Entertainment Television Inc., 126 F.3D 70
27
        (2d Cir. 09/16/1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
28
Farmers Ins. Exchange v. Zerin (1997) 53 Cal.App.4th 445, 451 . . . . . . . . . . . . . . . . . . . 20

1    Folsom v. Marsh, 9 F.Cas. 342, 348 (No. 4,901) (CCD Mass. 1841) . . . . . . . . . . . . . . . . .  13

2    Fox Film Corp. v. Doyal, 286 U.S. 123, 127 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

3    Gates Rubber Co. v. Bando Chem. Indus., 9 F.3d 823, 847 (10th Cir. 1993)  . . . . . . . . . .  24

     H.J. Inc. v. Northwestern Bell Tele. Co., 492 U.S. 229 (1989) . . . . . . . . . . . . . . . . . . . . . .  28
4
     Haines v. Kerner, 404 U.S. 519, 520-21 (1972)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
5
     Harper & Row v. Nation Enterprises et al., 105 S. Ct. 2218, 471 U.S. 539
3
              (U.S. 05/20/1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 12, 13, 22

7    Harris v. Rudin, Richman & Appel (1999) 74 Cal.App.4th 299, 307;

8    Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 112 S. Ct. 1311, 117 L. Ed.2d

9              532 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

10   Hughes v. Rowe, 449 U.S. 5, 9-10 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

     Iowa State University Research Foundation, Inc. v. American Broadcasting Cos., Inc., 621
11
              F.2d 57, 61 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
12
     La Resolana Architects, PA v. Clay Realtors Angel Fire, 416 F.3d 1195, 75 U.S.P.Q.2d 1496
13
              (10th Cir. 07/26/2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
14
     May Broadcasting Co. v. Boehm, 241 Neb. 660, 666, 490 N.W.2d 203, 207 (1992)  . . . . .  20
15
     Mazer v. Stein, 347 U.S. 201, 209 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
16
     Musik v. Burke, 913 F.2d 1390 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
17
     National Football League v. Prime Time 24 Joint Venture, 131 F.Supp.2d 458, 476 (S.D.N.Y.
18            2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

19   National Organization for Women v. Scheidler, 510 U.S. 249, 114 S. Ct. 798 (1994) . . . . .  27

20   Neder v. United States, 527 U.S. 1, 25, 119 S.Ct. 1827, 1841, 144 L.Ed.2d 35 (1999)  . . . .  25

     New York Times Co., Inc., et al. v. Tasini et al. 533 U.S. 483, 533 U.S. 483, 121 S.Ct. 2381,
21
              121 S.Ct. 2381, 150 L.Ed.2d 500, 150 L.Ed.2d 500 (U.S. 06/25/2001)  . . . . . . . . . .  17
22
     Noll v. Carlson, 809 F.2d 1446, 1448 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
23
     Norwest Corp. & Subs. v. Commissioner, 111 T.C. No. 5, 111 T.C. 105,
24
              Tax Ct. Rep. (CCH) 52,830, Tax Ct. Rep. Dec. (RIA) 111.5  U.S.Tax Ct. Aug 10,
25            1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

26   Pacific & Southern Co. v. Duncan, 744 F.2d 1490, 1495, n. 8 (CA11 1984)  . . . . . . . . . . .  11

27   Peer International Corp. v. Pausa Records, Inc. 909 F.2d 1332, 1336 (9th Cir. 1990) cert denied

     ProCD, Inc. v. Zeidenberg, 86 F.3d 1447 (7th Cir. 1996)  . . . . . . . . . . . . . . . . . . . . . . . . . .  23
28
     Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 69 U.S.P.Q.2d 1545 ( 01/23/2004)  . . . . . .  23

     Reves v. Ernst & Young, 507 U.S. 170 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

River City Markets, Inc. v. Fleming Foods West, Inc., 960 F.2d 1458 (9th Cir. 1992) . . . . . 27

Roy Export Co. Establishment v. Columbia Broadcasting System, Inc.,5
    03 F.Supp., at 1144  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Schmuck v. United States, 489 U.S. 705, 715, 109 S.Ct. 1443, 1450,
    103 L.Ed.2d 734 (1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Schuchart & Associates v. Solo Serve Corp., 540 F. Supp. 928, 942 (W.D. Tex. 1982) . . . 22

Sedima, S. P. R.L. v. Imrex Co., Inc., 473 U. S. 479, 496 (1985) . . . . . . . . . . . . . . . . . . . . . 8

Stevens Linen Associates, Inc. v. Mastercraft Corp.,656 F.2d 11, 15 (CA2 1981) . . . . . . . . 10

Summit Mach. Tool Mfg. v. Victor CNC Sys., 7 F.3d 1434, 1439-40 (9th Cir. 1993) . . . . . 23

TVT Records v. Def Jam Music Group, 279 F.Supp.2d 366, 382 (S.D.N.Y 2003)  . . . . . . . . 9

United States v. Hasson,333 F.3d 1264 (11th Cir. 2003),
    cert. denied, 541 U.S. 1056 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Ross, 131 F.3d 970, 984 (11th Cir.1997)  . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Hougham, 364 U.S. 310, 317 (1960)  . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Turkette, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed.2d 246 (1981) . . . 27

United States v. Wise, 550 F.2d 1180 (9th Cir. 1977)  . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Riccobene, 709 F.2d 214, 223-24 (3d Cir.), cert. denied, 464 U.S. 849,
    104 S.Ct. United States v. Brown, 79 F.3d 1550, 1557 (11th Cir.1996) . . . . . . . . . . 25

United States v. Kragness, 830 F.2d 842 at 857 (8th Cir.1987)  . . . . . . . . . . . . . . . . . . . . 27

United States v. Church, 955 F.2d 688 (11th Cir.), cert. denied, 506 U.S. 881 (1992) . . . . . 28

United States v. Lemm, 680 F.2d 1193, 1201 (8th Cir.1982), cert. denied, 459 U.S. 1110, 103
    S.Ct. 739, 74 L.Ed.2d 960 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Weissman v. Freeman, 868 F.2d 1313, 1325 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . 15

Worlds of Wonder, Inc. v. Veritel Learning Systems, Inc., 658 f. Supp 351, 354
    (N.D. Tex. 1986 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**INTRODUCTION**

1      Plaintiff Shell appears *pro se*. The court shall construe the pleadings and papers of a pro se litigant liberally. Hughes v. Rowe, 449 U.S. 5, 9-10 (1980); Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520-21 (1972); see also Eldridge v. Block, 832 F.2d 1132, 1137 (9th Cir. 1987).

2      Courts must Accept as true the factual allegations in the counterclaim and draw all reasonable inferences in favor of the non-moving party .Cervantes v. United States, 330 F.3d 1186, 1187 (9th Cir. 2003).

3      Courts cannot  treat pleading as "a game of skill in which one misstep by counsel may be decisive to the outcome." Conley v. Gibson, 355 U.S. 41, 48 (1957). United States v. Hougham, 364 U.S. 310, 317 (1960) states "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."

4      Before entering judgment based on an inadequate pro se complaint, a district court should briefly explain the deficiencies of the complaint to the pro se litigant and provide leave to amend unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment. See Noll v. Carlson, 809 F.2d 1446, 1448 (9th Cir. 1987).

5      Plaintiff markets her intellectual property on the Internet through her web site www.profane-justice.org and aliases which direct to www.profane-justice.org. This web site is her store front . Anyone wishing to purchase a license to copy her intellectual property have the opportunity to view it before purchasing. The original digital property and any user generated copies of that property are the property of Ms. Shell pending permissive use. For example: In viewing her web site content, the user permissively acquires a copy of the content which is stored in temporary memory of the user's computer. This is permissive use of her web site content. However, anyone wishing to transfer that temporary copy on their computer to a permanent storage medium of any kind must purchase a license to do so. That temporary copy is the tangible property of Ms. Shell and is purged from the user's computer when the

1    user stops viewing the content. The licensing and use of this property was set up under the

2    honor system, wherein anyone wishing to copy or distribute the property are required to

3    contact Ms. Shell for permission and/or pay the posted license fees before copying or

4    distributing . Buyers would have to supply their own technology to obtain their digital copy or

5    hard copy.  License fees and terms are included on each web page, including on the pages

3    printed by the defendants. The Internet is Ms. Shell's sole market for her online intellectual

7    property, her web site is her sole storefront for marketing that property. Internet Archive

8    abused the honor system, taking the subject tangible property, refusing to give consideration

9    for consideration received, with the intent to deprive the plaintiff of her rightful license fees.

10   6       For the counterclaim of copyright infringement, Ms. Shell has asserted ownership of

11   the subject property, supported it with copies of the Copyright Registration and has alleged

12   copying by the Defendants, and supported that with proof of the copying These are sufficient

13   facts to state a prima facie claim for Copyright Infringement.

14   7       There is no web site literary content exception to copyright protections and licensing

15   use of intellectual property. This Intellectual Property licensing practice is already well

16   established in practice and in law. Internet Archive has cited no authority under which Ms.

17   Shell's web site content should be treated any differently than other intellectual property.

18   8       For the counterclaim of Breach of Contract, Ms. Shell has alleged an offer and

19   identified the published terms of that offer (attached to the complaint), and acceptance. She

20   also alleged Internet Archive's, taking of the goods offered, and  breach through failure to pay

21   for goods taken, and resultant injury. These are sufficient facts to state a claim for Breach of

22   Contract. Breach of Contract claim is not preempted because it involves extra elements other

23   than copying.

24   9       Internet Archive makes the absurd claim that Ms. Shell asserts a web crawler accepted

25   the contract published on her web site. Internet Archive attempts to escape liability by mis-

26   stating the facts. Internet Archive is responsible for acquiring intellectual property through the

27   mechanism of its web crawlers. It is, therefore, personally responsible for the acts committed

28   as a result of that mechanism. If it or its agents failed to program the web crawlers to seek and

1   obtain permission from copyright owners before copying, it is directly responsible and liable

2   for that omission. Internet Archive cannot argue that it set a mechanism into motion to

3   perform a specific function which could forseeably incur liability and then claim they had

4   nothing to do with what that mechanism did.

5      10    For the counterclaim of Civil Theft/Conversion, Plaintiff has alleged ownership of the

3   subject property, Internet Archive exercised dominion and control over the subject property,

7   Internet Archive  exercised said dominion and control over the subject property without

8   Shell's authorization, Internet Archive  acted with the intent to deprive Ms. Shell permanently

9   of the use or benefit of property, and resultant injury due to the Internet Archives acts. These

10  are sufficient facts to state a claim for Civil Theft/Conversion. This claim is not preempted

11  because it involves extra elements other than copying.

12     11    For the counterclaim of Racketeering, Ms. Shell has alleged  (1) conduct e.g the

13  fraudulent, unlawful or unauthorized acquisition of copyrighted properties (2) of an enterprise

14  e.g. Internet Archive and its board of directors, agents and employees, Alexa Internet, Library

15  of Congress and Smithsonian Institute (3) through a pattern e.g. 87 known instances and

16  unknown millions of other identical instances (4) of racketeering activity e.g. Mail and wire

17  fraud, criminal infringement of copyright, theft and computer crimes. She has alleged injury to

18  her property and business as a direct result of the racketeering activity by Internet Archive.

19  Sedima, S. P. R.L. v. Imrex Co., Inc., 473 U. S. 479, 496 (1985). The Racketeering claim s not

20  preempted because it involves extra elements other than copying.

21                        **COPYRIGHT INFRINGEMENT**

22                              **Elements**

23     12    A prima facie case of copyright infringement is made by showing: (1) ownership of a

24  valid copyright, which is presumed when the copyright is registered with the copyright office

25  and, (2) copying by the defendant of protected elements of the work.

26     13    The term "copy" is judicial shorthand for the infringement of any of the copyright

27  owner's exclusive rights, Worlds of Wonder, Inc. v. Veritel Learning Systems, Inc., 658 f.

28  Supp 351, 354 (N.D. Tex. 1986)  including distribution (17 U.S.C. § 106).

Response to Motion to Dismiss Counterclaim   page 8

14   Copying a protected work is unlawful, regardless of whether the copying is deliberate, innocent, or even unconscious. Similarly, lack of knowledge such as that in vicarious infringement of the primary infringer's conduct, is not a defense. 3-12 MELVILLE NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 12.04 [A] [1] (2004).

15   Copyright is universally seen as a strict liability offense. See e.g., Educational Testing Service v. Simon, 95 F. Supp.2d 1081, 1087 (C.D.Cal. 1999) and TVT Records v. Def Jam Music Group, 279 F.Supp.2d 366, 382 (S.D.N.Y 2003).

**Evidence of Copying**

16   Copying may be shown by direct evidence of copying. It has been demonstrated in this case that: (1) Internet Archive had access to the Shell's work on the Internet. Access is established in this case through an admission by Internet Archive and (2) the infringing work is identical to Shell's.

**Burden of Proof**

17   Copying must be established by a preponderance of the evidence, and the plaintiff has the burden of proof on this element. Evidence of access and substantial similarity allows an inference of copying. The burden of producing evidence then shifts to the defendant.

18   Since fair use is an affirmative defense to a claim of infringement, the burden of proof is on its proponent. See Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994); American Geophysical Union v. Texaco, Inc. 60 F.3d 913, 918 (2d Cir. 1994) .

19   The burden of proving innocent intent is on the infringer, and it is 'a heavy one,' 2 WILLIAM F. PATRY COPYRIGHT LAW AND PRACTICE at 1175 (1994) quoted in National Football League v. Prime Time 24 Joint Venture, 131 F.Supp.2d 458, 476 (S.D.N.Y. 2001). "The defendant must prove that it did not know and should not have known that its conduct constituted infringement." Branch v. Ogilvy & Mather, Inc., 772 F.Supp 1359, 1364 (S.D.N.Y. 1991). Further, the infringer "must not only establish its good faith belief in the innocence of its conduct, [but] it must also show that it was reasonable in holding its belief." Peer International Corp. v. Pausa Records, Inc. 909 F.2d 1332, 1336 (9th Cir. 1990) *cert denied* 498 U.S. 1109 (1991).

Response to Motion to Dismiss Counterclaim   page 9

20      Internet Archive's infringement was not innocent. Disclaimers on the Internet Archive Wayback Machine which instruct web site owners how to have their web sites removed from the Wayback Machine actually establish that Internet Archive was well aware that its actions were unlawful and proves its wilfulness. Internet Archive knowingly committed theft of, possessed, stored, published and displayed several years worth of versions of Shell's web site, without notice to her and without her permission. Internet Archive made no attempt to contact Shell to negotiate a license fee reduction or waiver, nor to seek her permission. The law requires that Internet Archive ask permission of the copyright owner <u>before</u> copying or publicly displaying any copyrighted work. It is ***not*** the duty of the copyright owner to cruise the Internet and ask authors to stop infringing a copyright. Therefore, any claim that it published 'opt out' notices on its web site is irrelevant and specious and admissive of its wrongdoing. Internet Archive's Terms of Service agreement also clearly indicates that it understands copyright law, because it requires its users to agree to not engage in the same infringing conduct as a condition of their using the Wayback Machine that Internet Archive engages in when obtaining the web sites. Furthermore, since the Defendant did not know the Wayback Machine existed or publicly displayed her web site, she could not ask Internet Archive to remove her web site. Additionally, if the Internet Archive was acting in good faith, it would not have employed stealth to obtain illegal copies of Shell's web site and it would have advised her of its intentions and sought her permission and would not have refused to pay her license fees upon demand.

21      Once a copyright holder establishes with reasonable probability the existence of a causal connection between the infringement and a loss of revenue, the burden properly shifts to the infringer to show that this damage would have occurred had there been no taking of copyrighted expression. See 3 Nimmer § 14.02, at 14-7 -- 14-8.1. Petitioner establishes a prima facie case of actual damages. See <u>Stevens Linen Associates, Inc. v. Mastercraft Corp.,656 F.2d 11, 15 (CA2 1981)</u>.

## **Legality of Acquisition**

22      Pertaining to ownership of the physical manifestation or embodiment, e.g. the

Response to Motion to Dismiss Counterclaim   page 10

electronic copy or copies of the subject content from Shell's web site, the "first sale doctrine" as stated in 17 U.S.C. § 27, provides in pertinent part:

> "But nothing in this title shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained."

23    In <u>United States v. Wise, 550 F.2d 1180 (9th Cir. 1977)</u> ¶45, cert. denied, 434 U.S. 929, 54 L. Ed. 2d 290, 98 S. Ct. 416 (1977), which concerned a criminal prosecution under the pre-1976 Copyright Act, the court held that:

> The "first sale" doctrine provides that where a copyright owner parts with title to a particular copy of his copyrighted work, he divests himself of his exclusive right to vend that particular copy. While the proprietor's other copyright rights (reprinting, copying, etc.) remain unimpaired, the exclusive right to vend the transferred copy rests with the vendee, who is not restricted by statute from further transfers of that copy even though in breach of an agreement restricting its sale [fn10].[1] See <u>Harrison v. Maynard, Merrill & Co., 61 F. 689, 691 (2 Cir. 1894)</u>.

24    This principle presumes that the particular copy was lawfully obtained. If it wasn't, there is, as a matter of law, no 'first sale' and the Defendants have no rights to vend the unlawfully transferred copy.

25    By way of illustration: Ms. Shell has also published hard copy books. If Internet Archive were to desire copies of pages of one of those books, it would be required to acquire a copy of that book legally. It would not be permitted to walk into Ms. Shell's warehouse or a bookstore and steal a copy and be permitted fair use based on that stolen copy.

### Fair Use

26    Fair use is a mixed question of law and fact. <u>Pacific & Southern Co. v. Duncan, 744 F.2d 1490, 1495, n. 8 (CA11 1984)</u> (quoted in <u>Harper & Row v. Nation Enterprises et al., 105 S. Ct. 2218, 471 U.S. 539 at 560 (U.S. 05/20/1985))</u>.

27    By establishing a marketable right to the use of one's expression, copyright supplies

---

[1]

[fn10] If the vendee breaches an agreement not to sell the copy, he may be liable for the breach but he is not guilty of infringement. (See Breach of Contract claim, this case.)

1  the economic incentive to create and disseminate ideas. The U.S. Supreme Court stated in

2  Mazer v. Stein, 347 U.S. 201, 209 (1954):

3  "The economic philosophy behind the clause empowering Congress to grant patents
4  and copyrights is the conviction that encouragement of individual effort by personal
   gain is the best way to advance public welfare through the talents of authors and
5  inventors in 'Science and useful Arts."

3  28     Twentieth Century Music Corp. v. Aiken 422 U.S., at 156 states : "The immediate
7  effect of our copyright law is to secure a fair return for an 'author's' creative labor." Iowa

8  State University Research Foundation, Inc. v. American Broadcasting Cos., Inc., 621 F.2d 57,

9  61 (1980) notes:

10  "The fair use doctrine is not a license for corporate theft, empowering a court to ignore
11  a copyright whenever it determines the underlying work contains material of possible
12  public importance."

13  29     "The factors enumerated in §107 are not intended to be exhaustive, *or to single out*

14  *any particular use as presumptively a 'fair' use*. The drafters resisted pressures from special

15  interest groups to create presumptive categories of fair use, but structured the provision as an

16  *affirmative defense* requiring a case-by-case analysis. See H. R. Rep. No. 83, 90th Cong., 1st

17  Sess., 37 (1967); Patry 477, n. 4." Harper & Row 471 U.S. at 561. *(Emphasis added.)*

18  30     The listed categories in §107-- criticism, comment, news reporting, teaching,

19  scholarship, and research -- have an "illustrative and not limitative" function, Campbell, 510

20  U.S. 569.

21  31     17 U.S.C. § 107 (1)-(4). These factors "are not meant to be exclusive." Harper & Row,

22  471 U.S. at 560. "Nor may [they] be treated in isolation, one from another. All are to be

23  explored, and the results weighed together, in light of the purposes of copyright." Campbell,

24  510 U.S. at 578. Since fair use "is a doctrine the application of which always depends on

25  consideration of the precise facts at hand," American Geophysical at 916 (2d Cir. 1994).

26                              **Character and Purpose**

27  32     Internet Archive did not deal fairly in its acquisition and intended use of Ms. Shell's

28  web site content. Harper & Row 471 U.S. at 562 affirms the unclean hands and equitable

estoppel principles raised in the Plaintiff's complaint precluding the Defendants from benefitting from 'fair use' affirmative defense:

> Also relevant to the "character" of the use is "the propriety of the defendant's conduct." 3 Nimmer § 13.05[A], at 13-72. "Fair use presupposes 'good faith' and 'fair dealing.'" Time Inc. v. Bernard Geis Associates, 293 F.Supp. 130, 146 (SDNY 1968), quoting Schulman, Fair Use and the Revision of the Copyright Act, 53 Iowa L. Rev. 832 (1968).

33    The purpose and character of use weighs in favor of Ms. Shell because she is alleging appropriation without payment of the licensing fee. Faith Ringgold v. Black Entertainment Television Inc., 126 F.3D 70 (2d Cir. 09/16/1997), is instructive in this context, where a copyrighted quilt design displayed as part of a set decoration in a television program without paying the requisite license fees was deemed infringement.

34    Internet Archive used this work for precisely a central purpose for which it was created -- to be informative, superceding Ms. Shell's original. While Internet Archive asserts it's content is archived for research, it takes no steps to exclude other uses. The Wayback Machine made her web site was freely available to her competitors and her market, who could then avoid paying license fees for their use of her property. There are no mechanisms to prevent such use. Purpose and character of use includes that the challenged use need not supplant the original itself, only, as Justice Story said, whether the new work supercedes the "objects" of the original. Folsom v. Marsh, 9 F.Cas. 342, 348 (No. 4,901) (CCD Mass. 1841) (Story, J.) (stating fair use test).

35    Internet Archive's use is defined as "financial gain" in the No Electronic Theft Act, "including receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works." 17 U.S.C. § 101. Internet Archive's wholesale acquisitions of online content spawns grant moneys, donations and receipt of more online intellectual property. This weighs in favor of a profit based distinction.

36    Internet Archive, a business based on acquiring intellectual property without paying license fees to authors, profits from its use of Ms. Shell's property. Quoting Harper & Row, 471 U.S. at 562 "The crux of the profit/nonprofit distinction is not whether the sole motive of

Response to Motion to Dismiss Counterclaim    page 13

1    the use is monetary gain but whether the user stands to profit from exploitation of the

2    copyrighted material without paying the customary price. See <u>Roy Export Co. Establishment</u>

3    <u>v. Columbia Broadcasting System, Inc.,503 F.Supp., at 1144</u>; 3 Nimmer § 13.05[A][1], at

4    13-71, n. 25.3."

5    37    The profit/nonprofit factor includes the effect of the use upon the potential market for

3    or value of the copyrighted work. 17 U.S.C. § 107(4). "It requires courts to consider not only

7    the extent of market harm caused by the alleged infringer, but also 'whether unrestricted and

8    widespread conduct of the sort engaged in by the defendant . . . would result in substantially

9    adverse impact on the potential market for the original.'" <u>Campbell, 510 U.S. at 590</u> (quoting

10    Nimmer Section(s) 13.05[A].) Since the Internet is the only market wherein Ms. Shell's web

11    site works are marketed, it is a traditional, reasonable, or likely to be developed market to be

12    factored in when considering a challenged use upon a potential market.(See id. at 930;

13    Nimmer Section(s) 13.05[A].) She has been attempting to exploit license fees for copying her

14    online content. This market is already exploited by many online publishers.  If everyone were

15    to engage in the conduct that Internet Archive engaged in, Ms. Shell would suffer continuous

16    copyright infringement and loss of revenue, therefore this renders Internet Archive's use

17    commercial in nature.

18    38    Internet Archive's use was not transformative, but was merely a repackaging of the

19    original content. Courts have found that essence of "character and purpose" is the

20    transformative value, that is, productive use, of the secondary work compared to the original.

21    If "the secondary use adds value to the original--if [copyrightable expression in the original

22    work] is used as raw material, transformed in the creation of new information, new aesthetics,

23    new insights and understandings--this is the very type of activity that the fair use doctrine

24    intends to protect for the enrichment of society." Leval, Toward a Fair Use Standard, 103

25    Harv. L. Rev. 1105, 1111 (1990)

26    39    In <u>Campbell,</u> the Supreme Court stated that although it "is not absolutely necessary"

27    for a fair use to be transformative, "the more transformative the new work, the less will be the

28    significance of other factors, like commercialism, that may weigh against a finding of fair

1    use." 510 U.S. at 579

2    40    In Faith Ringgold v. Black Entertainment Television Inc., 126 F.3D 70, (2d Cir.

3    09/16/1997) ¶ 55, the court describes:

4      When all or a substantial portion of text that contains protectable expression is

5      included in another work, solely to convey the original text to the reader without
adding any comment or criticism, the second work may be said to have supplanted the

3      original because a reader of the second work has little reason to buy a copy of the
original. Although some books and other writings are profitably reread, their basic

7      market is the one-time reader. . . .but the challenged use need not supplant the original

8      itself, only, as Justice Story said, the "objects" of the original.

9    41    Taken in totality, character and purpose weighs heavily in favor of Ms. Shell.

10                    **Nature of the Copyrighted Work**

11    42    The second statutory fair use factor is the nature of the copyrighted work. Shell's web

12    site literary content is singularly creative, containing insightfully unique results of her research

13    which is not available from any other source, as well as containing editorial commentary,

14    discussion, analysis and legal documents which are not generally available anywhere else.

15    Taken in totality, this content represents a high degree of original and subjective thought, the

16    unique results of 15 years of dedicated qualitative research, and goes far beyond the realm of

17    mere factual works.

18                 **Amount and Substantiality of Portion Used**

19    43    The third statutory fair use factor is "the amount and substantiality of the portion used

20    in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3).

21    44    Though not an absolute rule, "generally, it may not constitute a fair use if the entire

22    work is reproduced." Nimmer on Copyright, § 13.05[A][3] at 13-178 (1997). See also,

23    Weissman v. Freeman, 868 F.2d 1313, 1325 (2d Cir. 1989).

24    45    Ms. Shell is, among other things, a publisher. Ms. Shell's store front web site includes

25    her entire inventory of online literary works. It also includes content written by authors other

26    than Ms. Shell, from whom she has obtained express permission to publish. Internet Archive

27    copied 87 complete, unedited, untransformed versions of her entire online inventory without

28    her authorization or knowledge.

**Effect of Use on Potential Market**

46      Ms. Shell reasserts the commercial nature of Internet Archive's use as stated previously in Character and Purpose of Use. Campbell, 510 U.S. at 590 (quoting Nimmer, § 13.05[A][4], at 13-102.61). "'[E]very commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright.' Sony, 464 U.S. at 451."

47      Ms. Shell has the right to license copying use of her web site content. American Geophysical, at ¶ 80:

> In two ways, Congress has impliedly suggested that the law should recognize licensing fees for photocopying as part of the "potential market for or value of" journal articles. First, section 108 of the Copyright Act narrowly circumscribes the conditions under which libraries are permitted to make copies of copyrighted works. See 17 U.S.C. § 108. Though this section states that it does not in any way affect the right of fair use, see id. § 108(f)(4), the very fact that Congress restricted the rights of libraries to make copies implicitly suggests that Congress views journal publishers as possessing the right to restrict photocopying, or at least the right to demand a licensing royalty from nonpublic institutions that engage in photocopying. Second, Congress apparently prompted the development of CCC by suggesting that an efficient mechanism be established to license photocopying, see S. Rep. No. 983, 93d Cong., 2d Sess. 122 (1974); S. Rep. No. 473, 94th Cong., 1st Sess. 70-71 (1975); H.R. Rep. No. 83, 90th Cong., 1st Sess. 33 (1968). It is difficult to understand why Congress would recommend establishing such a mechanism if it did not believe that fees for photocopying should be legally recognized as part of the potential market for journal articles.

48      Where Ms. Shell clearly does have an interest in exploiting a licensing market -- and especially where she has actually begun doing so -- "it is appropriate that potential licensing revenues for [copying] be considered in a fair use analysis." American Geophysical, 60 F.3d at 930.

49      Even if Internet Archive's use was arguably noncommercial, this factor would still weigh heavily in favor of Ms. Shell.

> Website operator's posting of private organization's copyrighted model building codes on the Internet was not a "fair use," as would preclude operator's liability for copyright infringement, although operator's use was noncommercial, because such use could severely undermine the market for those works if it were to become widespread. 17

1   U.S.C.A. § 107. <u>Veeck v. Southern Bldg. Code Congress Intern. Inc., 241 F.3d 398</u>

2   <u>(5th Cir. 2001)</u>, reh'g en banc granted, 268 F.3d 298 (5th Cir. 2001)

**Other Factors**

3   50   In Veek, supra, in the discussion on purpose and character of use, the en banc court

4   observed:

5        Veeck's posting of the codes on his website was not of a commercial nature or for

3        nonprofit educational purposes. Neither did his actions in this case have any

         transformative effect on the original work. In fact, there is neither an apparent nor

7        announced purpose behind Veeck's wholesale copying except that he chose to do so

8        and believes, empirically, that he has the unfettered right to do so. He presents no

9        affidavits or other summary judgment evidence to suggest that the townsfolk of Anna

         and Savoy or contractors, builders, or other interested parties, would not have access to

10       the codes without Veeck's intervention.

11  This is especially instructive in this case, were the Internet Archive shares the same sense of

12  free entitlement to Shell's on line property without paying license fees to acquire it and

13  exhibiting complete disregard to the effects of its copying on her business.

14  51   In <u>New York Times Co., Inc., et al. v. Tasini et al. 533 U.S. 483, 533 U.S. 483, 121</u>

15  <u>S.Ct. 2381, 121 S.Ct. 2381, 150 L.Ed.2d 500, 150 L.Ed.2d 500 (U.S. 06/25/2001)</u>, publishers

16  argued about "devastating" consequences, punching gaping holes in the electronic record of

17  history [should the publishers be required to purchase additional rights from authors of articles

18  already included in their hard copy periodicals for publication online] which the U. S.

19  Supreme court found  unavailing, stating that speculation about future harms is no basis for

20  this Court to shrink authorial rights created by Congress

21  52   In <u>A&M Records, Inc. v. Napster, Inc., 239 F. 3d 1004 (CA9 2001)</u>, the Ninth Circuit

22  interpreted commercial use as repeated and exploitive copying of copyrighted works, even

23  without direct economic benefit. Internet Archive acquired, distributed and displayed 87

24  versions of Ms. Shell's website between 1999 and 2006.

25  53   According to the U.S. Department of Justice, Ms. Shell even possess the absolute right

26  to exclude others from using her intellectual property at all. Quoting Gerald F. Masoudi,

27  Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice in a recent

28

1   speech[2]:

2       In the world of intellectual property (IP), the fundamental [property] right is similar: an
3       enforceable IP right means the right to exclude others from using your intellectual
        property right at all. Since there is no way to build a fence around an IP right,
4       businesses need the next best thing: quick access to the courts and access to
5       preliminary and permanent injunctions against infringement.

3   Antitrust Guidelines for the Licensing of Intellectual Property[3] states:

7       Intellectual property law bestows on the owners of intellectual property certain rights
8       to exclude others. These rights help the owners to profit from the use of their property.

9   54   This right to exclude has been upheld by the U.S. Supreme Court:

10      But nothing in the copyright statutes would  prevent an author from hoarding all of his
11      works during the term of the copyright. In fact, this Court has held that a copyright
        owner has the capacity arbitrarily to refuse to license one who seeks to exploit the
12      work. See  Fox Film Corp. v. Doyal, 286 U.S. 123, 127 (1932).

13  Internet Archive argues it is entitled to circumvent or be excluded from the exclusionary

14  mechanisms Ms. Shell deliberately placed on the use of her web site property, but has not

15  cited any authority under which they are entitled to be excluded from Ms. Shell's express

16  exclusion. Ms. Shell instituted a mechanism of a high license fee to facilitate that exclusion.

17  Ms. Shell's property was available for viewing by anyone who accessed her web site, but

18  copying, including but not limited to transferring the temporary files which were a

19  consequence of viewing the web site to permanent storage in any format was not licensed or

20  authorized. The primary principle of copyright, e.g. the public dissemination of ideas and

21  information was fulfilled by Ms. Shell.

22  55   Internet Archive has exceeded it's statutory archive rights to use Ms. Shell's

23  intellectual property. It has archived not one , but **three** copies, one in San Francisco, one in

24  Egypt and one in the Netherlands. Since Ms. Shell herself, makes her online works available

25  _____

26  2

27  ***Intellectual Property and Competition: Four Principles for Encouraging Innovation.*** Digital
    Americas 2006 Meeting Intellectual Property and Innovation in the Digital World
28  Sao Paolo, Brazil, April 11, 2006

    [3] Issued by the U.S. Department of Justice and the Federal Trade Commission, April 6, 1995

1    on her web site for public viewing, Internet Archive does not have the right to archive more

2    than one copy if it were not receiving direct or indirect commercial advantage. Finally,

3    Internet Archive, while technically a non-profit corporation, is receiving direct or indirect

4    commercial advantage for its business through its use of illegally acquired intellectual

5    property, including Ms. Shell's, property. 17 U.S.C. § 108. Defines limitations on exclusive

3    rights: Reproduction by libraries and archives to include:

7    (a) Except as otherwise provided in this title and notwithstanding the provisions of
8    section 106, it is not an infringement of copyright for a library or archives, or any of its
     employees acting within the scope of their employment, *to reproduce no more than*
9    *one copy* or phonorecord of a work, except as provided in subsections (b) and (c), or to
     distribute such copy or phonorecord, under the conditions specified by this section, if
10   — (1) the reproduction or distribution is made without any purpose of direct or indirect
11   commercial advantage; . . .
12   (b) The rights of reproduction and distribution under this section apply to three copies
     or phonorecords of an unpublished work duplicated solely for purposes of preservation
13   and security or for deposit for research use in another library or archives of the type
     described by clause (2) of subsection (a), if — (1) the copy or phonorecord reproduced
14   is currently in the collections of the library or archives; *and (2) any such copy or*
15   *phonorecord that is reproduced in digital format is not otherwise distributed in that*
     *format and is not made available to the public in that format outside the premises of*
16   *the library or archives.*
17   (c) The right of reproduction under this section applies to three copies or phonorecords
     of a published work duplicated solely for the purpose of replacement of a copy or
18   phonorecord *that is damaged, deteriorating, lost, or stolen, or if the existing format*
19   *in which the work is stored has become obsolete,* . . .

20   None of these provisions which would allow Internet Archive to archive 3 copies of Ms.

21   Shell's property without infringing, apply to Ms. Shell's web site content or to Internet

22   Archive's use.

23   56    Copyright law does not provide for an wholesale 'archive' exception to standard fair

24   use analysis or contractual obligations associated with its acquisition of Ms. Shell's

25   intellectual property.

26   17 U.S.C. § 108(f) Nothing in this section —
27   (4) in any way affects the right of fair use as provided by section 107, or any
     contractual obligations assumed at any time by the library or archives when it obtained
28   a copy or phonorecord of a work in its collections.

Response to Motion to Dismiss Counterclaim   page 19

**CIVIL THEFT/CONVERSION**

57    Conversion/civil theft was alleged in of Ms. Shell's First Amended Answer & Counterclaim.

58    The elements of a conversion are the plaintiff's ownership or right to possession of the property at the time of the conversion (¶44 Counterclaim); the defendant's conversion by a wrongful act or disposition of property rights (¶ 76 Counterclaim) ; and damages (¶78, 79 Counterclaim). Farmers Ins. Exchange v. Zerin (1997) 53 Cal.App.4th 445, 451.

59    The courts have recognized that, under federal law, a copyright creates an incorporeal property right that exists separately and independently from the tangible property, such as a book, a magazine, or a film, upon which the copyrighted material appears. American Multi-Cinema Inc. v. City of Westminster, 910 P.2d 64 (Colo.App. 07/13/1995).

60    The tangible digital format of the property stored on Shell's computer, computer system or computer network is distinct and separate from the exclusive rights associated with that tangible digital property. Indeed, copyright law mandates that a work is not copyrightable until it is "fixed in any tangible medium of expression". 17 U.S.C. § 102(a).

61    It has been held that even electronic signals through which a satellite transmits movies or other syndicated television programs constitute tangible personal property for this purpose. May Broadcasting Co. v. Boehm, 241 Neb. 660, 666, 490 N.W.2d 203, 207 (1992) states, "A transmission by satellite is the transmission of a tangible thing—an electronic signal. The mere fact that the signals may be received and stored shows that a tangible thing is in issue. The concept of physically storing an intangible thing is beyond comprehension.

62    In Norwest Corp. & Subs. v. Commissioner, 111 T.C. No. 5, 111 T.C. 105, Tax Ct. Rep. (CCH) 52,830, Tax Ct. Rep. Dec. (RIA) 111.5 U.S.Tax Ct. Aug 10, 1998, the U.S. Tax Court considered whether computer software was tangible personal property or intangible personal property for purposes of federal investment tax credits. The Court found that intangible intellectual property rights and the tangible or physical manifestations or embodiments of those rights are distinct property interests.

63    17 U.S.C. §. 202. Ownership of copyright as distinct from ownership of material object states:

1
2
3
4
5

Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

3
7
8
9
10
11
12

Historical and Revision Notes house report no. 94-1476 clarifies this as

"The principle restated in section 202 is a fundamental and important one: that copyright ownership and ownership of a material object in which the copyrighted work is embodied are entirely separate things. Thus, transfer of a material object does not of itself carry any rights under the copyright, and this includes transfer of the copy or phonorecord--the original manuscript, the photographic negative, the unique painting or statue, the master tape recording, etc.--in which the work was first fixed. Conversely, transfer of a copyright does not necessarily require the conveyance of any material object."

13
14
15
16
17
18

64    Pertaining to ownership of the physical manifestation or embodiment, e.g. the electronic copy or copies of the subject content from Ms. Shell's web site, the "first sale doctrine" as stated in 17 U.S.C. § 27, provides in pertinent part:

"But nothing in this title shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained."

19
20
21
22
23
24
25
26
27

65    In <u>United States v. Wise, 550 F.2d 1180 (9th Cir. 1977)</u>, which concerned a criminal prosecution under the pre-1976 Copyright Act, the court held that:

The "first sale" doctrine provides that where a copyright owner parts with title to a particular copy of his copyrighted work, he divests himself of his exclusive right to vend that particular copy. While the proprietor's other copyright rights (reprinting, copying, etc.) remain unimpaired, the exclusive right to vend the transferred copy rests with the vendee, who is not restricted by statute from further transfers of that copy.

This principle presumes that the particular copy was lawfully obtained. There is no 'first sale' in this case and Internet Archive has no rights to vend the unlawfully transferred copy.

28

66    When a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not

1   occur. Harper & Row Publishers, Inc. v. Nation Enterprises, 723 F.2d 195, 199-200 (2d Cir.

2   1983), rev'd on other grounds, 471 U.S. 539, 85 L. Ed. 2d 588, 105 S. Ct. 2218, 225 U.S.P.Q.

3   (BNA) 1073, 53 U.S.L.W. 4562 (1985), Schuchart & Associates v. Solo Serve Corp., 540 F.

4   Supp. 928, 942 (W.D. Tex. 1982); 1 M. Nimmer, Nimmer on Copyright § 1.01[B], at 1-9

5   (1985).

3   67     In Ehat v. Tanner, 780 F.2d 876 (10th Cir. 12/30/1985), the 10th Circuit stated that a

7   claim for conversion of the physical manifestation or embodiment or material object to

8   recover for the physical deprivation of the physical manifestation or embodiment or material

9   object is not preempted under copyright.

10  68     Shell's complaint of Civil Theft/Conversion rests in this principle, specifically, that the

11  infringer(s) did not obtain the aforementioned physical manifestation or embodiment or

12  material object lawfully, that the defendants exercised dominion and control over the material

13  object, without authorization,  with the intent to permanently deprive her of the use and

14  benefit of the material object. This was a material object that was available for transfer from

15  temporary computer memory to permanent storage in various mediums contingent upon

16  payment, from Shell's web site. Internet Archive obtained the material object without paying

17  for it and refused her demands for payment,  thereby depriving Ms. Shell of the benefit of

18  those license fees and deprived her of her control over the use of that stolen property.

19  69     This claim includes elements beyond copying. It includes the unlawful taking of a

20  material object which has been distinguished under Title 17 as distinct and different from the

21  intangible rights protected under copyright, the unauthorized exercise of dominion and control

22  over that object, and the intent to permanently deprive and the deprivation to Ms. Shell of the

23  use and benefit of that object. Therefore, Ms. Shell respectfully requests this court to deny

24  Internet Archive's motion to dismiss the claim for Civil Theft/Conversion.

25  **BREACH OF CONTRACT**

26  70     Elements of the contract cited in Ms. Shell counterclaim included (1) the existence of a

27  contract between the parties (¶81 Counterclaim); (2) the Ms. Shell's performance or excuse for

28  nonperformance  (¶85 Counterclaim); (3) Internet Archive's failure to perform (breach) (¶ 83, 84,

89 Counterclaim); and (4) resulting damages (¶ 90 Counterclaim). Harris v. Rudin, Richman & Appel (1999) 74 Cal.App.4th 299, 307; Careau & Co. v. Security Pacific Business Credit, Inc. (1990) 222 Cal.App.3d 1371, 1388. In an action based on a written contract, although a plaintiff need not plead the precise language of the contract, he or she must set forth the contract's legal effect by stating the substance of its relevant terms.(¶81 Counterclaim). Construction Protective Services, Inc. v. TIG Specialty Ins. Co. (2002) 29 Cal.4th 189, 199; see 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, §§ 479-480, pp. 572-573.

71      Browsewrap agreements like this have been found to be binding contracts. Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 69 U.S.P.Q.2d 1545 ( 01/23/2004).

72      If a state law claim includes an "extra element" that makes the right asserted qualitatively different from those protected under the Copyright Act, the state law claim is not preempted by the Copyright Act. Summit Mach. Tool Mfg. v. Victor CNC Sys., 7 F.3d 1434, 1439-40 (9th Cir. 1993); Bowers v. Bay-state Techs Inc., 320 F.3d 1317, 1323-24 (Fed. Cir. 2003).

73      Most courts have held that the Copyright Act does not preempt the enforcement of contractual rights. See Bowers, 320 F.3d at 1324-25 (noting that "most courts to examine this issue have found that the Copyright Act does not preempt contractual constraints on copyrighted articles"); Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, 991 F.2d 426, 431 (8th Cir. 1993); ProCD, Inc. v. Zeidenberg, 86 F.3d 1447 (7th Cir. 1996) (noting that "courts usually read preemption clauses to leave private contracts unaffected"). A state law tort claim concerning the unauthorized use of the software's end-product is not within the rights protected by the federal Copyright Act, and the 9th Cir, affirmed the district court's ruling rejecting preemption. Altera Corp. v. Clear Logic, Incorporated, 424 F.3d 1079, 76 U.S.P.Q.2d 1265 (9th Cir. 09/15/2005). The logic of these cases is persuasive here.

74      In ProCD, Inc. v. Zeidenberg, 86 F.3d 1447 (7th Cir. 1996), a consumer purchased ProCD's software and used it in a manner contrary to the terms of the shrinkwrap license. The right at issue is not the reproduction of the content, but is more appropriately characterized as the use of the content. Similarly, the Eighth Circuit distinguished between use and

Response to Motion to Dismiss Counterclaim   page 23

1    reproduction in Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, 991 F.2d 426, 431 (8th

2    Cir. 1993) ("National's use of the licensed programs constitutes an extra element in addition to

3    the copyright rights making this cause of action qualitatively different from an action for

4    copyright."), specifically holding that use is a qualitatively different right.

5    75    Unlike the general rights "against the world" that the copyright law gives every creator,

3    the court reasoned, contract rights require "generally affect only their parties" and require the

7    "extra element" of the parties' mutual assent and consideration (the law's term for something

8    of value exchanged). Indeed, more broadly, no contract right will ever be pre-empted, for

9    every contract right has an extra element: the contract.

10    76    The intent of the parties is the governing notion of contract law. Shell's intent is clear

11    from the language of her license agreement: Shell sought to exploit license fees for copying

12    her intellectual property. Internet Archive's intent is also objectively clear, it performed the act

13    indicating its assent to the terms published on the pages it printed when copied and distributed

14    Shell's web site content.

15    77    California law provides that an "agreement sufficient to constitute a contract for sale

16    may be found even though the moment of its making is undetermined." Cal. Com. Code at §

17    2204(2).

18    78    Although the Copyright Act preempts state copyright law, it does not eliminate all

19    state law actions. Gates Rubber Co. v. Bando Chem. Indus., 9 F.3d 823, 847 (10th Cir. 1993)

20    quoted in La Resolana Architects, PA v. Clay Realtors Angel Fire, 416 F.3d 1195, 75

21    U.S.P.Q.2d 1496 (10th Cir. 07/26/2005).

22    79    A party cannot claim that the party never intended to be bound if it is shown that the

23    party's conduct indicated acceptance of the agreement.  Signing of a contract is one way a

24    party may show assent.  Alternatively, if there is an offer and an act of acceptance, that

25    conduct implies the assent instead of a signed promise.  The performance of the requested act,

26    in this case the downloading of a copy, the copying and distribution of the web site content,

27    indicates assent to the terms of the offer. Since the contractual agreement is implied by action,

28    and it contains the elements of a binding agreement—offer, acceptance and consideration—it

Response to Motion to Dismiss Counterclaim   page 24

1   is, indeed, a binding contract.

2   80      Therefore, Shell's claims for Breach of Contract are not preempted by the Copyright

3   Act.

4                                      **RACKETEERING**

5   81      Internet Archive conspires to, and conducts or participates, directly or indirectly, in the

3   conduct of the enterprise through, mail and wire fraud, criminal copyright infringement, theft

7   and computer crime. Mail/wire fraud was pled with peculiarity in ¶114a of her Second

8   Amended Answer and Counterclaim pleading (Counterclaim), alleging the use of interstate

9   wires to transmit the stolen/infringed property from Ms. Shell's web site.

10  82      Ms. Shell alleged a scheme to defraud which encompassed  material

11  misrepresentations, or the omission or concealment of material facts, Neder v. United States,

12  527 U.S. 1, 25, 119 S.Ct. 1827, 1841, 144 L.Ed.2d 35 (1999), reasonably calculated to deceive

13  persons of ordinary prudence, United States v. Brown, 79 F.3d 1550, 1557 (11th Cir.1996)

14  (construing the mail fraud statute).  A material misrepresentation is one having a natural

15  tendency to influence, or capable of influencing, the decision maker to whom it is addressed.

16  Neder, 527 U.S. at 16, 119 S.Ct. at 1837.  United States v. Hasson,

17  333 F.3d 1264 (11th Cir. 2003), cert. denied, 541 U.S. 1056 (2004). Internet Archive's

18  concealment of material facts, e.g. its illegal acquisitions of Ms. Shell's web site content,

19  caused Ms. Shell to act as if Internet Archive had not acquired that content for 6 years, costing

20  her direct and indirect revenue, harming her business  as well as losing control over the use of

21  her property.

22  83      Ms. Shell also alleged that the interstate wires were knowingly used in furtherance of

23  the scheme or that such use was reasonably foreseeable. United States v. Ross, 131 F.3d 970,

24  984 (11th Cir.1997). [Footnote omitted.] To "cause" the interstate wires to be used, the use of

25  the wires need not be actually intended; it need only be reasonably foreseeable. Id. at 985.

26  84      To violate the wire fraud statute, it is not necessary that the transmitted information

27  include any misrepresentation. Schmuck v. United States, 489 U.S. 705, 715, 109 S.Ct. 1443,

28  1450, 103 L.Ed.2d 734 (1989) (construing mail fraud statute). An interstate wire transmission

Response to Motion to Dismiss Counterclaim   page 25

1   is "for the purpose of executing" the scheme to defraud if it is "incident to an essential part of

2   the scheme" or "a step in the plot." *Id.* at 710-11, 109 S.Ct. at 1447-48.

3   85      The subject wire transmissions were the mechanisms by which Ms. Shell's intellectual

4   property was transferred to Internet Archive.

5   86      Criminal copyright infringement is established by Ms. Shell allegation that Internet

3   Archive the reproduced  or distributed, including by electronic means, during any 180-day

7   period, of 1 or more copies of 1 or more of her copyrighted works, which have a total retail

8   value of more than $1,000.

9   87      The state racketeering claims are thefts which is explained in the previous section on

10  Theft.

11  88      The enterprise / racketeering activity distinction should be satisfied if: The enterprise is

12  a legal entity; The enterprise has a command structure or administrative hierarchy;  The

13  enterprise engages in some legitimate activity, even if the ultimate goal of the enterprise is

14  illegitimate; or The common activities of the enterprise extend beyond the minimal

15  association necessary to sustain the pattern of racketeering.

16  89      The RICO Act defines an enterprise simply as "any individual, partnership,

17  corporation, association, or other legal entity, and any union or group of individuals associated

18  in fact although not a legal entity." 18 U.S.C. § 1961(4).

19  90      The Enterprise alleged consists of an association in fact consisting of Internet Archive

20  and its board of directors and its agents and employees, and as passive participants or

21  instruments, Alexa Internet, Library of Congress, Smithsonian Institute. As such, it possesses

22  an administrative hierarchy or command structure. (¶96 Counterclaim)

23  91      This Enterprise is engaged in  the legitimate business of legally obtaining and

24  archiving online intellectual property. Internet Archive provides  technology and mechanisms

25  whereby copyright owners can voluntarily donate a copy of their intellectual properties to

26  Internet Archive for inclusion in the Internet Archive Wayback Machine. This is a function

27  separate and distinct from the Racketeering activity which uses a different mechanism to

28  illegally acquire intellectual properties.

Response to Motion to Dismiss Counterclaim   page 26

92      The enterprise is separate and distinct from the predicate acts because it contains an "organizational pattern beyond what was necessary to perpetrate the predicate crimes" United States v. Bledsoe, 674 F.2d 647 (8th Cir.), cert. denied, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982).

93      It "is not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity...." United States v. Kragness, 830 F.2d 842 at 857 (8th Cir.1987).(quoting United States v. Riccobene, 709 F.2d 214, 223-24 (3d Cir.), cert. denied, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983)).

94      Though it is not required, proof the enterprise conducts lawful activity unrelated to the pattern of racketeering will often serve to prove the enterprise is separate from the pattern of racketeering. E.g., United States v. Lemm, 680 F.2d 1193, 1201 (8th Cir.1982), cert. denied, 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983).

95      The named Enterprise exists independently from the racketeering activity in which it engages.  See Chang v. Chen, 80 F.3d 1293, 1298 (9th Cir. 1996) (citing United States v. Turkette, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed.2d 246 (1981)).

96      The Enterprise is distinct from the Defendant Person(s). Defendant persons named include Internet Archive, Brewster Kahle, Rick Prelinger and Kathleen Burch. River City Markets, Inc. v. Fleming Foods West, Inc., 960 F.2d 1458 (9th Cir. 1992). An individual can associate with his business entity for RICO purposes. United States v. Benny, 786 F.2d 1410, 1415-16 (9th Cir.). This list of potential defendants is not all inclusive. Ms. Shell had to limit the number of named defendants as a practical matter related to the burden of litigation.

97      The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. There is nothing in the statute that requires more "separateness" than that.  Cedric Kushner Promotions, Ltd., v. Don King, 533 U.S. 158 (2001).

98      An Enterprise need not have an economic motive. National Organization for Women v. Scheidler, 510 U.S. 249, 114 S. Ct. 798 (1994).

99      Internet Archive operates in California. Shell, a victim,  markets her intellectual

Response to Motion to Dismiss Counterclaim   page 27

1   property in Colorado. The Enterprise engages in conduct affecting interstate commerce.

2   Musik v. Burke, 913 F.2d 1390 (9th Cir. 1990). (¶115 Counterclaim)

3   100   Internet Archive, Brewster Kahle, Rick Prelinger and Kathleen  participate in the

4   operation or management of the Enterprise.  Reves v. Ernst & Young, 507 U.S. 170 (1993).

5   They play some part in directing the enterprise's affairs, Id. at 179. (¶102 Counterclaim)

3   101   The alleged multiple predicate acts involving 87 separate and distinct but identically

7   executed incidents over 6 years, conducted by the same Enterprise is sufficient to establish a

8   pattern of racketeering activity.  H.J. Inc. v. Northwestern Bell Tele. Co., 492 U.S. 229 (1989).

9   Establishment of a pattern "requires the showing of a relationship between the predicates and

10  of the threat of continuing activity."  H. J. Inc.  v.  Northwestern Bell, 492 U.S. at 239, 109 S.

11  Ct. 2893 .

12  102   The predicate acts were committed by the same participates, for the same purposes,

13  with the same results and the same methods of commission involving a distinct class of

14  victims e.g. online authors, and have been occurring since 1996. "Related" conduct "embraces

15  criminal acts that have the same or similar purposes, results, participants, victims, or methods

16  of commission, or otherwise are interrelated by distinguishing characteristics and are not

17  isolated events." H.J. Inc. at 240, 109 S. Ct. 2893.

18  103   Continuity has been established  by virtue of the fact that the predicate acts or offenses

19  are part of an ongoing entity's regular way of doing business since 1996. Thus, the threat of

20  continuity is sufficiently established where the predicates can be attributed to

21  104   Internet Archive operating as part of a long-term association that exists for criminal

22  purposes. H.J. Inc at 242-43, 109 S.Ct. at 2902.  United States v. Church, 955 F.2d 688 (11th

23  Cir.), cert. denied, 506 U.S. 881 (1992).

24  105   RICO's "proximate cause" standard required a direct relationship between the RICO

25  violation and the injury. There must be some direct relation between the injury asserted and

26  the injurious conduct alleged. The injurious conduct alleged is the fraudulent taking of Ms.

27  Shell's intellectual property and criminal copyright infringement through the mechanism of

28  interstate wire transmission. Ms. Shell reasonably relied on the fraudulent omission or

1    concealment of material facts relating to the taking of her copyrighted property. There is no

2    legal theory under which Internet Archive can argue that it is entitled to materially mislead

3    someone or conceal material facts in order to appropriate that person's property without their

4    permission and without paying for it. The injury to Ms. Shell is the loss of that property and

5    the loss of revenue caused by that taking. The frauds and the infringements were the reason for

3    Ms. Shell's injury to property and business. Holmes v. Securities Investor Protection Corp.,

7    503 U.S. 258, 112 S. Ct. 1311, 117 L. Ed.2d 532 (1992).

8    106    Ms. Shell has suffered injury to her online publishing business and her intellectual

9    property.

10    **CONCLUSION**

11    107    Ms. Shell has stated sufficient facts to sustain her counterclaims.

12    108    She requests this court to deny Internet Archive's motion to dismiss counterclaims.

13    109    Because Internet Archive fraudulently concealed its conduct from Ms. Shell, it must be

14    equitably estopped from asserting a statute of limitations defense.

15    110    State Racketeering claims cannot be adequately cited until jurisdiction and venue is

16    decided, therefore Ms. Shell requests leave to amend her counterclaim & cross claim to cite

17    state specific claims after the jurisdiction/venue issue is decided.

18    111    If there are errors or deficiencies in her Pleadings, Ms. Shell requests this court to

19    allow her to amend to them.

20    Respectfully submitted April 20, 2006

21

22

23    Defendant and Counterclaim Plaintiff

24    CERTIFICATE OF SERVICE

25    I, Suzanne Shell hereby certify that true and correct copies of the attached document **RESPONSE TO MOTION TO DISMISS COUNTERCLAIMS AND MEMORANDUM IN SUPPORT OF**

26    **RESPONSE** were placed in the United States Mail, first class mail, postage prepaid on April 20,

27    2006 to: Perkins Coie, LLP

28    180 Townsend St. Third Floor San Francisco, CA 94107      Suzanne Shell - April 20, 2006

Response to Motion to Dismiss Counterclaim    page 29