FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

DEC - 8 2006

GREGORY C. LANGHAM
CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action no.___06-CV-01726-LTB-CBS

INTERNET ARCHIVE
     Plaintiff and Counterclaim Defendant
v.
SUZANNE SHELL
     Defendant and
     Counterclaim Plaintiff and
     Third Party Plaintiff
v.
BREWSTER KAHLE - an individual
RICK PRELINGER - an individual
KATHLEEN BURKE - an individual
     Third Party Defendants

## RESPONSE TO INTERNET ARCHIVE'S MOTION TO DISMISS COUNTERCLAIMS

Comes now Suzanne Shell with her response to Internet Archive's MOTION TO DISMISS
COUNTERCLAIMS, requesting this Court to Deny Internet Archive's MOTION TO DISMISS
COUNTERCLAIMS and in support thereof submits the following.

### INTRODUCTION

1      Plaintiff Shell appears *pro se*. The court shall construe the pleadings and papers of a pro
se litigant liberally. Hughes v. Rowe, 449 U.S. 5, 9-10 (1980); Estelle v. Gamble, 429 U.S. 97,
106 (1976); Haines v. Kerner, 404 U.S. 519, 520-21 (1972); see also Eldridge v. Block, 832 F.2d
1132, 1137 (9th Cir. 1987).

2      Courts must Accept as true the factual allegations in the counterclaim and draw all
reasonable inferences in favor of the non-moving party .Cervantes v. United States, 330 F.3d
1186, 1187 (9th Cir. 2003).

3      Courts cannot treat pleading as "a game of skill in which one misstep by counsel may be
decisive to the outcome." Conley v. Gibson, 355 U.S. 41, 48 (1957). United States v. Hougham,
364 U.S. 310, 317 (1960) states "The Federal Rules reject the approach that pleading is a game

of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."

4       Before entering judgment based on an inadequate pro se complaint, a district court should briefly explain the deficiencies of the complaint to the pro se litigant and provide leave to amend unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment. See Noll v. Carlson, 809 F.2d 1446, 1448 (9th Cir. 1987).

5       Plaintiff markets her intellectual property on the Internet through her web site www.profane-justice.org and aliases which direct to www.profane-justice.org. This web site is her store front . Anyone wishing to purchase a license to copy her intellectual property have the opportunity to view it before purchasing. The original digital property and any user generated copies of that property are the property of Ms. Shell pending permissive use. For example: In viewing her web site content, the user permissively acquires a copy of the content which is stored in temporary memory of the user's computer. This is permissive use of her web site content. However, anyone wishing to transfer that temporary copy on their computer to a permanent storage medium of any kind must purchase a license to do so. That temporary copy is the tangible property of Ms. Shell and is purged from the user's computer when the user stops viewing the content. The licensing and use of this property was set up under the honor system, wherein anyone wishing to copy or distribute the property are required to contact Ms. Shell for permission and/or pay the posted license fees before copying or distributing . Buyers would have to supply their own technology to obtain their digital copy or hard copy.  License fees and terms are included on each web page, including on the pages printed by the defendants. The Internet is Ms. Shell's sole market for her online intellectual property, her web site is her sole storefront for marketing that property. Internet Archive  abused the honor system, taking the subject tangible property, refusing to give consideration for consideration received, with the intent to deprive the plaintiff of her rightful license fees.

6       For the counterclaim of copyright infringement, Ms. Shell has asserted ownership of the subject property, supported it with copies of the Copyright Registration and has alleged copying by the Defendants, and supported that with proof of the copying These are sufficient facts to state

Response to Motion to Dismiss Counterclaim   page 2

a prima facie claim for Copyright Infringement.

7       There is no web site literary content exception to copyright protections and licensing use of intellectual property. This Intellectual Property licensing practice is already well established in practice and in law. Internet Archive has cited no authority under which Ms. Shell's web site content should be treated any differently than other intellectual property.

8       Internet Archive makes the absurd claim that Ms. Shell asserts a web crawler accepted the contract published on her web site. Internet Archive attempts to escape liability by mis-stating the facts. Internet Archive is responsible for acquiring intellectual property through the mechanism of the web crawlers it puts into motion. It is, therefore, personally responsible for the acts committed as a result of that mechanism. If it or its agents failed to program the web crawlers to seek and obtain permission from copyright owners before copying, it is directly responsible and liable for that omission. Internet Archive cannot argue that it set a mechanism into motion to perform a specific function which could forseeably incur liability and then claim they had nothing to do with what that mechanism did.

## COPYRIGHT INFRINGEMENT

### Elements

9       A prima facie case of copyright infringement is made by showing: (1) ownership of a valid copyright, which is presumed when the copyright is registered with the copyright office and, (2) copying by the defendant of protected elements of the work.

10      Copying a protected work is unlawful, regardless of whether the copying is deliberate, innocent, or even unconscious. Similarly, lack of knowledge such as that in vicarious infringement of the primary infringer's conduct, is not a defense.

11      Copyright is universally seen as a strict liability offense. See e.g., Educational Testing Service v. Simon, 95 F. Supp.2d 1081, 1087 (C.D.Cal. 1999) and TVT Records v. Def Jam Music Group, 279 F.Supp.2d 366, 382 (S.D.N.Y 2003).

### Evidence of Copying

12      Internet Archive admits to copying. This fact is not in dispute.

### Burden of Proof

Response to Motion to Dismiss Counterclaim   page 3

13      Since fair use is an affirmative defense to a claim of infringement, the burden of proof is on its proponent. See <u>Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994); American Geophysical Union v. Texaco, Inc. 60 F.3d 913, 918 (2d Cir. 1994)</u> .

14      The burden of proving innocent intent is on the infringer, and it is 'a heavy one,' 2 WILLIAM F. PATRY COPYRIGHT LAW AND PRACTICE at 1175 (1994) quoted in <u>National Football League v. Prime Time 24 Joint Venture, 131 F.Supp.2d 458, 476 (S.D.N.Y. 2001)</u>. "The defendant must prove that it did not know and should not have known that its conduct constituted infringement." <u>Branch v. Ogilvy & Mather, Inc., 772 F.Supp 1359, 1364 (S.D.N.Y. 1991)</u>. Further, the infringer "must not only establish its good faith belief in the innocence of its conduct, [but] it must also show that it was reasonable in holding its belief." <u>Peer International Corp. v. Pausa Records, Inc. 909 F.2d 1332, 1336 (9th Cir. 1990)</u> *cert denied* 498 U.S. 1109 (1991).

15      Internet Archive's infringement was not innocent. Disclaimers on the Internet Archive Wayback Machine which instruct web site owners how to have their web sites removed from the Wayback Machine actually establish that Internet Archive was well aware that its actions were unlawful and proves its wilfulness. Internet Archive knowingly committed theft of, possessed, stored, published and displayed several years worth of versions of Shell's web site, without notice to her and without her permission. Internet Archive made no attempt to contact Shell to negotiate a license fee reduction or waiver, nor to seek her permission. The law requires that Internet Archive ask permission of the copyright owner <u>before</u> copying or publicly displaying any copyrighted work. It is *not* the duty of the copyright owner to cruise the Internet and ask authors to stop infringing a copyright. Therefore, any claim that it published 'opt out' notices on its web site is irrelevant and specious and admissive of its wrongdoing. Internet Archive's Terms of Service agreement also clearly indicates that it understands copyright law, because it requires its users to agree to not engage in the same infringing conduct as a condition of their using the Wayback Machine that Internet Archive engages in when obtaining the web sites. Furthermore, since the Defendant did not know the Wayback Machine existed or publicly displayed her web site, she could not ask Internet Archive to remove her web site. Additionally, if the Internet

Archive was acting in good faith, it would not have employed stealth to obtain illegal copies of Shell's web site and it would have advised her of its intentions and sought her permission and would not have refused to pay her license fees upon demand.

16      Once a copyright holder establishes with reasonable probability the existence of a causal connection between the infringement and a loss of revenue, the burden properly shifts to the infringer to show that this damage would have occurred had there been no taking of copyrighted expression. See 3 Nimmer § 14.02, at 14-7 -- 14-8.1. Petitioner establishes a prima facie case of actual damages. See Stevens Linen Associates, Inc. v. Mastercraft Corp.,656 F.2d 11, 15 (CA2 1981).

### Legality of Acquisition

17      Pertaining to ownership of the physical manifestation or embodiment, e.g. the electronic copy or copies of the subject content from Shell's web site, the "first sale doctrine" as stated in 17 U.S.C. § 27, provides in pertinent part:

> "But nothing in this title shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained."

18      This principle presumes that the particular copy was lawfully obtained. If it wasn't, there is, as a matter of law, no 'first sale' and the Defendants have no rights to vend the unlawfully transferred copy.

19      By way of illustration: Ms. Shell has also published hard copy books. If Internet Archive were to desire copies of pages of one of those books, it would be required to acquire a copy of that book legally. It would not be permitted to walk into Ms. Shell's warehouse or a bookstore and steal a copy and be permitted fair use based on that stolen copy.

### Fair Use

20      Fair use is a mixed question of law and fact. Pacific & Southern Co. v. Duncan, 744 F.2d 1490, 1495, n. 8 (CA11 1984) (quoted in Harper & Row v. Nation Enterprises et al., 105 S. Ct. 2218, 471 U.S. 539 at 560 (U.S. 05/20/1985)).

21      Twentieth Century Music Corp. v. Aiken 422 U.S., at 156 states : "The immediate effect

of our copyright law is to secure a fair return for an 'author's' creative labor." Iowa State University Research Foundation, Inc. v. American Broadcasting Cos., Inc., 621 F.2d 57, 61 (1980) notes:

> "The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance."

22      The factors enumerated in §107 are not intended to be exhaustive, *or to single out any particular use as presumptively a 'fair' use*. The *affirmative defense* requires a case-by-case analysis. See H. R. Rep. No. 83, 90th Cong., 1st Sess., 37 (1967); Patry 477, n. 4." Harper & Row 471 U.S. at 561. *(Emphasis added.)*

23      The listed categories in §107-- criticism, comment, news reporting, teaching, scholarship, and research -- have an "illustrative and not limitative" function, Campbell, 510 U.S. 569.

24      17 U.S.C. § 107 (1)-(4). These factors "are not meant to be exclusive." Harper & Row, 471 U.S. at 560. "Nor may [they] be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." Campbell, 510 U.S. at 578. Since fair use "is a doctrine the application of which always depends on consideration of the precise facts at hand," American Geophysical at 916 (2d Cir. 1994).

### Character and Purpose

25      Internet Archive did not deal fairly in its acquisition and intended use of Ms. Shell's web site content. Harper & Row 471 U.S. at 562 affirms the unclean hands and equitable estoppel principles raised in the Plaintiff's complaint precluding the Defendants from benefitting from 'fair use' affirmative defense:

> Also relevant to the "character" of the use is "the propriety of the defendant's conduct." 3 Nimmer § 13.05[A], at 13-72. "Fair use presupposes 'good faith' and 'fair dealing.'" Time Inc. v. Bernard Geis Associates, 293 F.Supp. 130, 146 (SDNY 1968), quoting Schulman, Fair Use and the Revision of the Copyright Act, 53 Iowa L. Rev. 832 (1968).

26      The purpose and character of use weighs in favor of Ms. Shell because she is alleging appropriation without payment of the licensing fee - which is infringement. Faith Ringgold v. Black Entertainment Television Inc., 126 F.3D 70 (2d Cir. 09/16/1997).

27      Internet Archive used this work for precisely a central purpose for which it was created --
to be informative, superceding Ms. Shell's original. While Internet Archive asserts it's content is
archived for research, it takes no steps to exclude other uses. The Wayback Machine made her
web site was freely available to her competitors and her market, who could then avoid paying
license fees for their use of her property. There are no mechanisms to prevent such use.  Purpose
and character of use includes that the challenged use need not supplant the original itself, Folsom
v. Marsh, 9 F.Cas. 342, 348 (No. 4,901) (CCD Mass. 1841) (Story, J.) (stating fair use test).

28      Internet Archive's  use is defined as "financial gain" in the No Electronic Theft Act,
"including receipt, or expectation of receipt, of anything of value, including the receipt of other
copyrighted works." 17 U.S.C. § 101. Internet Archive's wholesale acquisitions of online content
spawns grant moneys, donations and receipt of more online intellectual property. This weighs in
favor of a profit based distinction.

29      Internet Archive, a business based on acquiring intellectual property without paying
license fees to authors,  profits from its use of Ms. Shell's property. Quoting Harper & Row, 471
U.S. at 562 "The crux of the profit/nonprofit distinction is not whether the sole motive of the use
is monetary gain but whether the user stands to profit from exploitation of the copyrighted
material without paying the customary price." See Roy Export Co. Establishment v. Columbia
Broadcasting System, Inc.,503 F.Supp., at 1144.

30      The profit/nonprofit factor includes the effect of the use upon the potential market for or
value of the copyrighted work. 17 U.S.C. § 107(4). Unrestricted and widespread conduct of the
sort engaged in by the defendant would result in substantially adverse impact on the potential
market for the original. Campbell, 510 U.S. at 590 (quoting Nimmer Section(s) 13.05[A].) Since
the Internet is the only market wherein Ms. Shell's web site works are marketed, it is a
traditional, reasonable, or likely to be developed market to be factored in when considering a
challenged use upon a potential market.(See id. at 930; Nimmer Section(s) 13.05[A].)  If
everyone were to engage in the conduct that Internet Archive engaged in, Ms. Shell would suffer
continuous copyright infringement and loss of revenue, therefore this renders Internet Archive's
use commercial in nature.

31     Internet Archive's use was not transformative, but was merely a repackaging of the original content. Courts have found that essence of "character and purpose" is the transformative value, that is, productive use, of the secondary work compared to the original.

32     In Faith Ringgold v. Black Entertainment Television Inc., 126 F.3D 70, (2d Cir. 09/16/1997) ¶ 55, the court describes:

> When all or a substantial portion of text that contains protectable expression is included in another work, solely to convey the original text to the reader without adding any comment or criticism, the second work may be said to have supplanted the original because a reader of the second work has little reason to buy a copy of the original. Although some books and other writings are profitably reread, their basic market is the one-time reader. . . .but the challenged use need not supplant the original itself, only, as Justice Story said, the "objects" of the original.

33     Taken in totality, character and purpose weighs heavily in favor of Ms. Shell.

## Nature of the Copyrighted Work

34     The second statutory fair use factor is the nature of the copyrighted work. Shell's web site literary content is singularly creative, containing insightfully unique results of her research which is not available from any other source, as well as containing editorial commentary, discussion, analysis and legal documents which are not generally available anywhere else. Taken in totality, this content represents a high degree of original and subjective thought, the unique results of 15 years of dedicated qualitative research, and goes far beyond the realm of mere factual works.

## Amount and Substantiality of Portion Used

35     The third statutory fair use factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3).

36     Though not an absolute rule, "generally, it may not constitute a fair use if the entire work is reproduced." Nimmer on Copyright, § 13.05[A][3] at 13-178 (1997). See also, Weissman v. Freeman, 868 F.2d 1313, 1325 (2d Cir. 1989).

37     Ms. Shell is, among other things, a publisher. Ms. Shell's store front web site includes her entire inventory of online literary works. It also includes content written by authors other than Ms. Shell, from whom she has obtained express permission to publish. Internet Archive copied 87 complete, unedited, untransformed versions of her entire online inventory without her

Response to Motion to Dismiss Counterclaim    page 8

authorization or knowledge and without paying license fees.

<u>**Effect of Use on Potential Market**</u>

38      Ms. Shell reasserts the commercial nature of Internet Archive's use as stated previously in

Character and Purpose of Use. Campbell, 510 U.S. at 590 (quoting Nimmer, § 13.05[A][4], at

13-102.61). "'[E]very commercial use of copyrighted material is presumptively an unfair

exploitation of the monopoly privilege that belongs to the owner of the copyright.' Sony, 464

U.S. at 451."

39      Ms. Shell has the right to license copying use of her web site content. American

Geophysical, at ¶ 80 affirms the right of an author to charge licence fees for copies, even to

libraries who want to archive copies, and a duty by libraries to pay the fees.

40      It is appropriate that potential licensing revenues for [copying] be considered in a fair use

analysis. American Geophysical, 60 F.3d at 930.

41      Even if Internet Archive's use was arguably noncommercial, this factor would still weigh

heavily in favor of Ms. Shell.

> Website operator's posting of private organization's copyrighted model building codes on
> the Internet was not a "fair use," as would preclude operator's liability for copyright
> infringement, although operator's use was noncommercial, because such use could
> severely undermine the market for those works if it were to become widespread. 17
> U.S.C.A. § 107. Veeck v. Southern Bldg. Code Congress Intern. Inc., 241 F.3d 398 (5th
> Cir. 2001), reh'g en banc granted, 268 F.3d 298 (5th Cir. 2001)

**Other Factors**

42      Like Veek, supra, Internet Archive shares the same sense of free entitlement to Shell's on

line property without paying license fees to acquire it and exhibiting complete disregard to the

effects of its copying on her business, a practice which was rejected by the court.

43      In New York Times Co., Inc., et al. v. Tasini et al. 533 U.S. 483, 533 U.S. 483, 121 S.Ct.

2381, 121 S.Ct. 2381, 150 L.Ed.2d 500, 150 L.Ed.2d 500 (U.S. 06/25/2001) , publishers argued

about "devastating" consequences, punching gaping holes in the electronic record of history

[should the publishers be required to purchase additional rights from authors of articles already

included in their hard copy periodicals for publication online] which the U. S. Supreme court

found  unavailing, stating that speculation about future harms is no basis for this Court to shrink

authorial rights created by Congress

44      In A&M Records, Inc. v. Napster, Inc., 239 F. 3d 1004 (CA9 2001), the Ninth Circuit interpreted commercial use as repeated and exploitive copying of copyrighted works, even without direct economic benefit. Internet Archive acquired, distributed and displayed 87 versions of Ms. Shell's website between 1999 and 2006.

45      According to the U.S. Department of Justice, Ms. Shell even possess the absolute right to exclude others from using her intellectual property at all. Quoting Gerald F. Masoudi, Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice in a recent speech[1]:

> . . .an enforceable [intellectual property] IP right means the right to exclude others from using your intellectual property right at all. Since there is no way to build a fence around an IP right, businesses need the next best thing: quick access to the courts and access to preliminary and permanent injunctions against infringement.

Antitrust Guidelines for the Licensing of Intellectual Property[2] states:

> Intellectual property law bestows on the owners of intellectual property certain rights to exclude others. These rights help the owners to profit from the use of their property.

46      This right to exclude has been upheld by the U.S. Supreme Court:

> But nothing in the copyright statutes would  prevent an author from hoarding all of his works during the term of the copyright. In fact, this Court has held that a copyright owner has the capacity arbitrarily to refuse to license one who seeks to exploit the work. See Fox Film Corp. v. Doyal, 286 U.S. 123, 127 (1932).

Internet Archive argues it is entitled to circumvent or be excluded from the exclusionary mechanisms Ms. Shell deliberately placed on the use of her web site property, but has not cited any authority under which they are entitled to be excluded from Ms. Shell's express exclusion. Ms. Shell instituted a mechanism of a high license fee to facilitate that exclusion. Ms. Shell's property was available for viewing by anyone who accessed her web site, but copying, including

---

[1]

*Intellectual Property and Competition: Four Principles for Encouraging Innovation.* Digital Americas 2006 Meeting Intellectual Property and Innovation in the Digital World Sao Paolo, Brazil, April 11, 2006

[2] Issued by the U.S. Department of Justice and the Federal Trade Commission, April 6, 1995

but not limited to transferring the temporary files which were a consequence of viewing the web

site to permanent storage in any format was not licensed or authorized. The primary principle of

copyright, e.g. the public dissemination of ideas and information was fulfilled by Ms. Shell.

47      Internet Archive has exceeded it's statutory archive rights to use Ms. Shell's intellectual

property. It has archived not one , but **three** copies, one in San Francisco, one in Egypt and one

in the Netherlands. Since Ms. Shell herself, makes her online works available on her web site for

public viewing, Internet Archive does not have the right to archive more than one copy if it were

not receiving direct or indirect commercial advantage. Finally, Internet Archive, while

technically a non-profit corporation, is receiving direct or indirect commercial advantage for its

business through its use of illegally acquired intellectual property, including Ms. Shell's,

property. 17 U.S.C. § 108. Defines limitations on exclusive rights: Reproduction by libraries and

archives to include:

> (a) Except as otherwise provided in this title and notwithstanding the provisions of
> section 106, it is not an infringement of copyright for a library or archives, or any of its
> employees acting within the scope of their employment, *to reproduce no more than one*
> *copy* or phonorecord of a work, except as provided in subsections (b) and (c), or to
> distribute such copy or phonorecord, under the conditions specified by this section, if —
> (1) the reproduction or distribution is made without any purpose of direct or indirect
> commercial advantage; . . .
>
> (b) The rights of reproduction and distribution under this section apply to three copies or
> phonorecords of an unpublished work duplicated solely for purposes of preservation and
> security or for deposit for research use in another library or archives of the type described
> by clause (2) of subsection (a), if — (1) the copy or phonorecord reproduced is currently
> in the collections of the library or archives; *and (2) any such copy or phonorecord that is*
> *reproduced in digital format is not otherwise distributed in that format and is not made*
> *available to the public in that format outside the premises of the library or archives.*
> (c) The right of reproduction under this section applies to three copies or phonorecords of
> a published work duplicated solely for the purpose of replacement of a copy or
> phonorecord *that is damaged, deteriorating, lost, or stolen, or if the existing format in*
> *which the work is stored has become obsolete,* . . .

None of these provisions which would allow Internet Archive to archive 3 copies of Ms. Shell's

property without infringing, apply to Ms. Shell's web site content or to Internet Archive's use.

48      Copyright law does not provide for an wholesale 'archive' exception to standard fair use

analysis or contractual obligations associated with its acquisition of Ms. Shell's intellectual property.

> 17 U.S.C. § 108(f) Nothing in this section —
> (4) in any way affects the right of fair use as provided by section 107, or any contractual obligations assumed at any time by the library or archives when it obtained a copy or phonorecord of a work in its collections.

## CIVIL THEFT/CONVERSION

49      Conversion/civil theft  was alleged in of Ms. Shell's First Amended Answer & Counterclaim.

50      The elements of a conversion are the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights ; and damages.  Farmers Ins. Exchange v. Zerin (1997) 53 Cal.App.4th 445, 451.

51      The courts have recognized that, under federal law, a copyright creates an incorporeal property right that exists separately and independently from the tangible property, such as a book, a magazine, or a film, upon which the copyrighted material appears. American Multi-Cinema Inc. v. City of Westminster, 910 P.2d 64 (Colo.App. 07/13/1995).

52      The tangible digital format of the property stored on Shell's computer, computer system or computer network is distinct and separate from the exclusive rights associated with that tangible digital property. Indeed, copyright law mandates that a work is not copyrightable until it is "fixed in any tangible medium of expression". 17 U.S.C. § 102(a).

53      In May Broadcasting Co. v. Boehm, 241 Neb. 660, 666, 490 N.W.2d 203, 207 (1992) states, "A transmission by satellite is the transmission of a tangible thing—an electronic signal. The mere fact that the signals may be received and stored shows that a tangible thing is in issue. The concept of physically storing an intangible thing is beyond comprehension.

54      In Norwest Corp. & Subs. v. Commissioner, 111 T.C. No. 5, 111 T.C. 105, Tax Ct. Rep. (CCH) 52,830, Tax Ct. Rep. Dec. (RIA) 111.5  U.S.Tax Ct. Aug 10, 1998, the U.S. Tax Court considered whether computer software was tangible personal property or intangible personal property for purposes of federal investment tax credits. The Court found that intangible

intellectual property rights and the tangible or physical manifestations or embodiments of those rights are distinct property interests.

55    17 U.S.C. §. 202. Ownership of copyright as distinct from ownership of material object states:

> Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

Historical and Revision Notes house report no. 94-1476 clarifies this as

> "The principle restated in section 202 is a fundamental and important one: that copyright ownership and ownership of a material object in which the copyrighted work is embodied are entirely separate things. Thus, transfer of a material object does not of itself carry any rights under the copyright, and this includes transfer of the copy or phonorecord--the original manuscript, the photographic negative, the unique painting or statue, the master tape recording, etc.--in which the work was first fixed. Conversely, transfer of a copyright does not necessarily require the conveyance of any material object."

56    When a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur. Harper & Row Publishers, Inc. v. Nation Enterprises, 723 F.2d 195, 199-200 (2d Cir. 1983), rev'd on other grounds, 471 U.S. 539, 85 L. Ed. 2d 588, 105 S. Ct. 2218, 225 U.S.P.Q. (BNA) 1073, 53 U.S.L.W. 4562 (1985), Schuchart & Associates v. Solo Serve Corp., 540 F. Supp. 928, 942 (W.D. Tex. 1982); 1 M. Nimmer, Nimmer on Copyright § 1.01[B], at 1-9 (1985).

57    In Ehat v. Tanner, 780 F.2d 876 (10th Cir. 12/30/1985), the 10th Circuit stated that a claim for conversion of the physical manifestation or embodiment or material object to recover for the physical deprivation of the physical manifestation or embodiment or material object is not preempted under copyright.

58    The Internet Archive did not obtain the aforementioned physical manifestation or embodiment or material object lawfully, that Internet Archive exercised dominion and control

over the material object, without authorization, with the intent to permanently deprive her of the use and benefit of the material object. Internet Archive obtained the material object without paying for it and refused her demands for payment,  thereby depriving Ms. Shell of the benefit of those license fees and deprived her of her control over the use of that stolen property.

59      This claim includes elements beyond copying. It includes the unlawful taking of a material object which has been distinguished under Title 17 as distinct and different from the intangible rights protected under copyright, the unauthorized exercise of dominion and control over that object, and the intent to permanently deprive and the deprivation to Ms. Shell of the use and benefit of that object. Therefore, Ms. Shell respectfully requests this court to deny Internet Archive's motion to dismiss the claim for Civil Theft/Conversion.

## BREACH OF CONTRACT

60      Elements of the contract cited in Ms. Shell counterclaim included (1) the existence of a contract between the parties; (2) the Ms. Shell's performance or excuse for nonperformance ; (3) Internet Archive's failure to perform (breach); and (4) resulting damages). Harris v. Rudin, Richman & Appel (1999) 74 Cal.App.4th 299, 307; Careau & Co. v. Security Pacific Business Credit, Inc. (1990) 222 Cal.App.3d 1371, 1388.  In an action based on a written contract, although a plaintiff need not plead the precise language of the contract, he or she must set forth the contract's legal effect by stating the substance of its relevant terms. Construction Protective Services, Inc. v. TIG Specialty Ins. Co. (2002) 29 Cal.4th 189, 199; see 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, §§ 479-480, pp. 572-573.

61      Browsewrap agreements like this have been found to be  binding contracts. Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 69 U.S.P.Q.2d 1545 ( 01/23/2004).

62      If a state law claim includes an "extra element" that makes the right asserted qualitatively different from those protected under the Copyright Act, the state law claim is not preempted by the Copyright Act. Summit Mach. Tool Mfg. v. Victor CNC Sys., 7 F.3d 1434, 1439-40 (9th Cir. 1993); Bowers v. Bay-state Techs Inc., 320 F.3d 1317, 1323-24 (Fed. Cir. 2003).

63      Most courts have held that the Copyright Act does not preempt the enforcement of contractual rights. See Bowers, 320 F.3d at 1324-25;  Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, 991 F.2d 426, 431 (8th Cir. 1993); ProCD, Inc. v. Zeidenberg, 86 F.3d 1447 (7th

Cir. 1996). A state law tort claim concerning the unauthorized use of the software's end-product is not within the rights protected by the federal Copyright Act, and the 9th Cir, affirmed the district court's ruling rejecting preemption. Altera Corp. v. Clear Logic, Incorporated, 424 F.3d 1079, 76 U.S.P.Q.2d 1265 (9th Cir. 09/15/2005). The logic of these cases is persuasive here.

64      ProCD, Inc. v. Zeidenberg, 86 F.3d 1447 (7th Cir. 1996) explains the right at issue is not the reproduction of the content, but is more appropriately characterized as the use of the content. Similarly, the Eighth Circuit distinguished between use and reproduction in Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, 991 F.2d 426, 431 (8th Cir. 1993), specifically holding that use is a qualitatively different right.

65      Unlike the general rights "against the world" that the copyright law gives every creator, the court reasoned, contract rights require "generally affect only their parties" and require the "extra element" of the parties' mutual assent and consideration.

66      The intent of the parties is the governing notion of contract law. Shell's intent is clear from the language of her license agreement: Shell sought to exploit license fees for copying her intellectual property. Internet Archive's intent is also objectively clear, it performed the act indicating its assent to the terms published on the pages it printed when copied and distributed Shell's web site content.

67      Although the Copyright Act preempts state copyright law, it does not eliminate all state law actions. Gates Rubber Co. v. Bando Chem. Indus., 9 F.3d 823, 847 (10th Cir. 1993) quoted in La Resolana Architects, PA v. Clay Realtors Angel Fire, 416 F.3d 1195, 75 U.S.P.Q.2d 1496 (10th Cir. 07/26/2005).

68      A party cannot claim that the party never intended to be bound if it is shown that the party's conduct indicated acceptance of the agreement.. If there is an offer and an act of acceptance, that conduct implies the assent instead of a signed promise. The performance of the requested act, in this case the downloading of a copy, the copying and distribution of the web site content, indicates assent to the terms of the offer. Since the contractual agreement is implied by action, and it contains the elements of a binding agreement—offer, acceptance and consideration—it is, indeed, a binding contract.

69      Shell's claims for Breach of Contract are not preempted by the Copyright Act.

Response to Motion to Dismiss Counterclaim   page 15

## RACKETEERING

70      Internet Archive conspires to, and conducts or participates, directly or indirectly, in the conduct of the enterprise through, mail and wire fraud, criminal copyright infringement, theft and computer crime. Mail/wire fraud was pled with peculiarity in her Second Amended Answer and Counterclaim pleading (Counterclaim), alleging the use of interstate wires to transmit the stolen/infringed property from Ms. Shell's web site.

71      Ms. Shell alleged a scheme to defraud which encompassed  material misrepresentations, or the omission or concealment of material facts, Neder v. United States, 527 U.S. 1, 25, 119 S.Ct. 1827, 1841, 144 L.Ed.2d 35 (1999), reasonably calculated to deceive persons of ordinary prudence, United States v. Brown, 79 F.3d 1550, 1557 (11th Cir.1996) (construing the mail fraud statute).  A material misrepresentation is one having a natural tendency to influence, or capable of influencing, the decision maker to whom it is addressed. Neder, 527 U.S. at 16, 119 S.Ct. at 1837.  United States v. Hasson, 333 F.3d 1264 (11th Cir. 2003), cert. denied, 541 U.S. 1056 (2004). Internet Archive's concealment of material facts, e.g. its illegal acquisitions of Ms. Shell's web site content, caused Ms. Shell to act as if Internet Archive had not acquired that content for 6 years, costing her direct and indirect revenue, harming her business  as well as losing control over the use of her property.

72      Ms. Shell also alleged that the interstate wires were knowingly used in furtherance of the scheme or that such use was reasonably foreseeable. United States v. Ross, 131 F.3d 970, 984 (11th Cir.1997). To "cause" the interstate wires to be used, the use of the wires need not be actually intended; it need only be reasonably foreseeable. Id. at 985.

73      To violate the wire fraud statute, it is not necessary that the transmitted information include any misrepresentation. Schmuck v. United States, 489 U.S. 705, 715, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989) (construing mail fraud statute). An interstate wire transmission is "for the purpose of executing" the scheme to defraud if it is "incident to an essential part of the scheme" or "a step in the plot." Id. at 710-11, 109 S.Ct. at 1447-48.

74      The subject wire transmissions were the mechanisms by which Ms. Shell's intellectual property was transferred to Internet Archive.

75      Criminal copyright infringement is established by Ms. Shell allegation that Internet
Archive the reproduced or distributed, including by electronic means, during any 180-day
period, of 1 or more copies of 1 or more of her copyrighted works, which have a total retail value
of more than $1,000.

76      The state racketeering claims are thefts which is explained in the previous section on
Theft.

77      The enterprise / racketeering activity distinction should be satisfied if: The enterprise is a
legal entity; The enterprise has a command structure or administrative hierarchy;  The enterprise
engages in some legitimate activity, even if the ultimate goal of the enterprise is illegitimate; or
the common activities of the enterprise extend beyond the minimal association necessary to
sustain the pattern of racketeering.

78      The RICO Act defines an enterprise simply as "any individual, partnership, corporation,
association, or other legal entity, and any union or group of individuals associated in fact
although not a legal entity."  18 U.S.C. § 1961(4).

79      The Enterprise alleged consists of an association in fact consisting of Internet Archive
and its board of directors and its agents and employees, and as passive participants or
instruments, Alexa Internet, Library of Congress, Smithsonian Institute. As such, it possesses an
administrative hierarchy or command structure.

80      This Enterprise is engaged in  the legitimate business of legally obtaining and archiving
online intellectual property. Internet Archive provides  technology and mechanisms whereby
copyright owners can voluntarily donate a copy of their intellectual properties to Internet Archive
for inclusion in the Internet Archive Wayback Machine. This is a function separate and distinct
from the Racketeering activity which uses a different mechanism to illegally acquire intellectual
properties.

81      The enterprise is separate and distinct from the predicate acts because it contains an
"organizational pattern beyond what was necessary to perpetrate the predicate crimes" United
States v. Bledsoe, 674 F.2d 647 (8th Cir.), cert. denied, 459 U.S. 1040, 103 S.Ct. 456, 74
L.Ed.2d 608 (1982).

82      It "is not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity...." United States v. Kragness, 830 F.2d 842 at 857 (8th Cir.1987),(quoting United States v. Riccobene, 709 F.2d 214, 223-24 (3d Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983)).

83      Though it is not required, proof the enterprise conducts lawful activity unrelated to the pattern of racketeering will often serve to prove the enterprise is separate from the pattern of racketeering. E.g., United States v. Lemm, 680 F.2d 1193, 1201 (8th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983).

84      The named Enterprise exists independently from the racketeering activity in which it engages.  See Chang v. Chen, 80 F.3d 1293, 1298 (9th Cir. 1996) (citing United States v. Turkette, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed.2d 246 (1981)).

85      The Enterprise is distinct from the Defendant Person(s). Defendant persons named include Internet Archive, Brewster Kahle, Rick Prelinger and Kathleen Burch. River City Markets, Inc. v. Fleming Foods West, Inc., 960 F.2d 1458 (9th Cir. 1992). An individual can associate with his business entity for RICO purposes. United States v. Benny, 786 F.2d 1410, 1415-16 (9th Cir.). This list of potential defendants is not all inclusive. Ms. Shell had to limit the number of named defendants as a practical matter related to the burden of litigation.

86      The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. There is nothing in the statute that requires more "separateness" than that.  Cedric Kushner Promotions, Ltd., v. Don King, 533 U.S. 158 (2001).

87      An Enterprise need not have an economic motive. National Organization for Women v. Scheidler, 510 U.S. 249, 114 S. Ct. 798 (1994).

88      Internet Archive operates in California. Shell, a victim,  markets her intellectual property in Colorado. The Enterprise engages in conduct affecting interstate commerce.  Musik v. Burke, 913 F.2d 1390 (9th Cir. 1990).

89      Internet Archive, Brewster Kahle, Rick Prelinger and Kathleen  participate in the operation or management of the Enterprise.   Reves v. Ernst & Young, 507 U.S. 170 (1993).

They play some part in directing the enterprise's affairs, *Id.* at 179.

90      The alleged multiple predicate acts involving 87 separate and distinct but identically executed incidents over 6 years, conducted by the same Enterprise is sufficient to establish a pattern of racketeering activity.  H.J. Inc. v. Northwestern Bell Tele. Co., 492 U.S. 229 (1989). Establishment of a pattern "requires the showing of a relationship between the predicates and of the threat of continuing activity."

91      The predicate acts were committed by the same participates, for the same purposes, with the same results and the same methods of commission involving a distinct class of victims e.g. online authors, and have been occurring since 1996. "Related" conduct "embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." H.J. Inc. at 240, 109 S. Ct. 2893.

92      Continuity has been established  by virtue of the fact that the predicate acts or offenses are part of an ongoing entity's regular way of doing business since 1996. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to Internet Archive operating as part of a long-term association that exists for criminal purposes. H.J. Inc at 242-43, 109 S.Ct. at 2902.  United States v. Church, 955 F.2d 688 (11th Cir.), *cert. denied,* 506 U.S. 881 (1992).

93      RICO's "proximate cause" standard required a direct relationship between the RICO violation and the injury. The injurious conduct alleged is the fraudulent taking of Ms. Shell's intellectual property and criminal copyright infringement through the mechanism of interstate wire transmission. Ms. Shell reasonably relied on the fraudulent omission or concealment of material facts relating to the taking of her copyrighted property. There is no legal theory under which Internet Archive can argue that it is entitled to materially mislead someone or conceal material facts in order to appropriate that person's property without their permission and without paying for it. The injury to Ms. Shell is the loss of that property and the loss of revenue caused by that taking. The frauds and the infringements were the reason for Ms. Shell's injury to property and business. Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 112 S. Ct. 1311, 117

L. Ed.2d 532 (1992).

94     Ms. Shell has suffered injury to her online publishing business and her intellectual

property.

## CONCLUSION

95     Ms. Shell has stated sufficient facts to sustain her counterclaims.

96     Shell's counterclaims are not preempted by the Copyright act because they contain

elements beyond mere copying.

97     Shell  requests this court to deny Internet Archive's motion to dismiss counterclaims.

98     Because Internet Archive fraudulently concealed its conduct from Ms. Shell, it must be

equitably estopped from asserting a statute of limitations defense.

99     If there are errors or deficiencies in her Pleadings, Ms. Shell requests this court to allow

her to amend to them.

Respectfully submitted December 6, 2006

Defendant and Counterclaim Plaintiff

CERTIFICATE OF SERVICE

I, Suzanne Shell  hereby certify that true and correct copies of the attached document **RESPONSE TO
MOTION TO DISMISS COUNTERCLAIMS** were placed in the United States Mail, first class mail,
postage prepaid on December 6, 2006 to:

Perkins Coie, LLP
180 Townsend St. Third Floor
San Francisco, CA 94107

Kathleen Burch
Internet Archive
Presidio of San Francisco
PO Box 2924
San Francisco,CA 94129

Brewster Kahle
513 B Simonds Loop
San Francisco,CA  94129

Rick Prelinger
301 8th Street, Suite 215
San Francisco,CA 94103

Suzanne Shell   December 6, 2006